UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

MELVIN RANDALL PATTERSON #407659     CIVIL ACTION NO. 16-cv-1416

VERSUS     JUDGE WALTER

KEITH DEVILLE     MAGISTRATE JUDGE HORNSBY

**REPORT AND RECOMMENDATION**

**Introduction**

Melvin Randall Patterson ("Petitioner") was convicted of two counts of attempted second-degree murder after a bench trial before Caddo Parish District Judge Katherine Dorroh. He was sentenced to serve 30 years on each count, to run concurrently, without benefits. The convictions were affirmed on direct appeal. State v. Patterson, 184 So.3d 739 (La. App. 2d Cir. 2015), writ denied, 190 So.3d 1190 (La. 2016).

Petitioner then filed this federal habeas corpus petition and attacked his state court convictions on the grounds that: (1) the evidence was insufficient, (2) the trial judge erred in not admitting statements captured on a patrol car recording system, and (3) the trial court erred in not allowing defense counsel to fully cross-examine a prosecution witness about a pending murder charge against him. For the reasons that follow, it is recommended that the petition be denied.

**Sufficiency of the Evidence**

    **A. Relevant Evidence**

Fred and Bessie Jordan hosted a birthday party in July 2012 for Bessie at their home on Elmview Place in Shreveport. The party started at 8:00 p.m. and had between 40 and 75 guests, but by around 2:00 a.m., things were winding down with only about 20 people left. Petitioner and a female friend arrived at about 2:00 a.m. and were greeted by Fred Jordan, who they did not know. Petitioner said he had been invited by Mrs. Jordan's uncle, Wayne Seymour, and he asked to see him. Mr. Jordan told Petitioner that the party was winding down, and he would have to leave.

Witnesses described Petitioner as being fidgety and upset at being turned away. He and his female companion returned to his car, and soon afterward several shots were fired at the Jordans' home from the direction of the street. Mrs. Jordan was shot in the left buttock and lower leg, which required an ambulance ride and two days in the hospital, followed by surgery to remove the bullet. Louis Grant, who is Mrs. Jordan's brother, was shot near his chest and also required surgery to remove a bullet.

There is not much dispute about the events described above. Petitioner admits he was at the party and was turned away. The only issue is whether Petitioner or someone else fired the shots. Three witnesses said Petitioner was the gunman. Petitioner denied it.

Bessie Jordan testified that she had been drinking and was tipsy but not drunk. She had seen Petitioner before when she worked at Thrifty Liquor, but she did not know him personally or have any problems with him. Mrs. Jordan testified that, after her husband turned Petitioner away, Petitioner made a cell phone call and said, "They will not let me in

this MF'ing party." Petitioner then walked to his silver Dodge car, "pulls off, and comes back and shots are fired." She said she heard the shots coming from the street, and she ran. Mrs. Jordan later picked Petitioner from a six-man photo lineup, and she identified him live in court as the shooter.

Louis Grant, Jr. testified that he never drinks and was sober that night, a point that Fred Jordan corroborated. He was at his sister's party when he noticed Petitioner talking with Fred and asking to see Wayne Seymour. Mr. Grant described Petitioner as "really fidgeting, looking crazy, so to speak." Fred told Petitioner that if he had not seen Wayne Seymour yet, then he would not see him. Petitioner got upset, started walking down the driveway, and made a call on his cell phone to tell someone that he "won't let me in the party." Mr. Grant said that Wayne Seymour was at the party and was in the backyard at this time.

Mr. Grant testified that Petitioner got in the driver's side of a silver Chrysler, and a young woman got in the passenger side. Grant then turned because he saw Wayne Seymour coming from the backyard and yelled his name. Wayne stopped, "and I turned back to look at the car, and I heard two shots. And after that, he just pulled the trigger and didn't stop." Mr. Grant clarified that the "he" pulling the trigger was Petitioner. He also said that he "saw some fire" and turned around and ran in the house, where there were about 15 or 20 people.

Mr. Grant identified Petitioner as the shooter in a six-man photo lineup, and he identified him live in court. On cross-examination, defense counsel confronted Grant with a recorded statement he made to Detective Curtis that indicated he did not see the shooter.

Page 3 of 18

Counsel quoted Grant as telling the detective that he "heard two shots, bam, bam." He continued, "So I turned around to see where they were coming from, and I couldn't see at that time, and then it just went crazy after that. And then I saw dirt moving, like coming right towards me, and I turned around and I ran in the house." Mr. Grant admitted that this was an accurate recitation of his recorded statement, and he adopted it as his testimony.

Fred Jordan, who admitted to a lengthy criminal history of more than 15 convictions ranging from urinating in public to drug dealing, said that he had been drinking but was only tipsy. When Petitioner showed up, Mr. Jordan told him that he needed to leave because the party was pretty much over and they were not taking any more guests. Mr. Jordan said it "wasn't a major exchange," and Petitioner walked off and got in the driver's side of his car with a young lady on the passenger side. He said Petitioner drove down to the end of the block, "made a U-turn, came back up the street, and began firing shots." Mr. Jordan was asked: "This is what you saw with your own eyes?" He answered yes.

Mr. Jordan admitted that he tried to get in the ambulance with his wife to go with her to the hospital, but the officers would not let him do so. He conceded that he was emotional, may have spat in one of the officer's faces, and he was taken to the ground and handcuffed. He originally faced criminal charges regarding the incident, but they were dismissed.

Mr. Jordan testified that he heard "maybe five or six" shots fired. He identified Petitioner in a photo lineup and in court as the man who fired the shots. On cross-examination, counsel tried to establish that Mr. Jordan did not actually see Petitioner pull the trigger and fire the shots. Mr. Jordan was adamant that he saw Petitioner "before, after,

and during" the shooting and "could make him out" because his window was down. Mr. Jordan was confronted with a recorded statement he gave to Detective Curtis, who asked if he saw the gun. Mr. Jordan answered, "I didn't - - the funny thing about it, I didn't even see the gun. I didn't see a gun. I didn't even see it, but I'm looking at the car and I just don't - - I Just, I don't know, I guess I just blanked out."

Mr. Jordan was also confronted with a recording of the 911 call he made in which he reported that, "Some niggas just shot up [my] house." Jordan was asked about his use of the plural term to suggest multiple shooters. He agreed that he did use the plural term on the recording, and he said on redirect that he did so to refer to Petitioner and his female passenger.

Sgt. Stephen Plunkett of the Shreveport Police Department testified that he responded to the 911 call. He saw several people yelling, a couple of fights broke out, and it was generally a drunken melee. He did not formally interview anyone for statements, but he asked some questions in an attempt to get the gist of what happened. His body microphone captured his comment that Mrs. Jordan was intoxicated from liquor.

Ronnie Smith was Petitioner's cell mate at the Caddo Correctional Center. He had prior convictions for malfeasance in office and felony theft, and he was facing a charge of attempted first-degree murder of his wife. Smith testified that he and Petitioner would talk at night, and Petitioner confessed to the shooting. Petitioner allegedly described how he went to the party to see Wayne, was told to leave, got in a heated argument, and then fired the shots that hit the victims. Smith denied that he had received any promises of a deal by the prosecutor, who happened to be the same prosecutor who was handling his attempted

murder case. He said Petitioner did not say how many times he shot or what type of gun he used. Smith denied looking at Petitioner's legal papers in his cell to get the information that he provided. Smith said that Petitioner told him that he had been drinking that night. Petitioner did not brag about the shooting, and he was sorry it happened.

Shreveport Police Officer Zachary Johnson testified that Mr. Jordan was yelling and spit in his face, which led to Jordan being handcuffed. Officer Johnson said he spoke with Louis Grant and asked him if he saw anything. Grant continually said, "No, no, I didn't see anything." Grant just encouraged the officer to check on his sister. Johnson wrote in his report that both victims stated that they did not see anybody shooting a weapon. Johnson said, on the stand, however, that Mrs. Jordan could only moan and groan at the time and did not actually make a statement. Mrs. Jordan agreed on rebuttal that she did not speak with Officer Johnson at the scene. Her only statement was given to Detective Curtis several days later.

Sheron Horton was the Jordans' next-door neighbor. She was in bed when she heard the gunshots, and she looked out her window. She said she "saw some young mens jumping in a car." She was not sure how many men but guessed about three. The car then "took off kind of fast." She admitted that she did not know who the people were, and she would have likely run away if she had been outside and heard gun shots.

Petitioner elected to testify. He admitted prior convictions for second-degree battery, burglary, and distribution of marijuana. He said Wayne Seymour invited him to the party, and he drove there with Tersheka White, who was his neighbor. He did not take a gun with him, and he did not have any reason to think there would be trouble at the party.

Petitioner said he parked at the end of the driveway, and he and Ms. White walked up to the house, where they encountered a male and female in the front yard. Petitioner introduced himself by his nickname, "Frog," and said that he was looking for Wayne, who had told him to stop by the party. The male, now known to be Fred Jordan, asked him to leave, and he did. Petitioner said he was walking to his car "and right before I got ready to stick the key in I started hearing shots, and that's when I went ahead and opened up the door, got in the car, and I almost actually left Tersheka." Ms. White got in the car, and they both left. Petitioner denied having a gun or firing any shots, and he said he did not see who did the shooting.

Petitioner said that his former cell mate Ronnie Smith was lying and had given testimony based on Petitioner's legal papers that he kept in a locker in their cell. The papers included discovery responses, police reports, and similar material. Petitioner did not have the ability to lock the locker, and there were frequent occasions when Ronnie Smith would have been left alone in the cell. Petitioner said he once caught Smith reading one of his personal letters from his mother. Petitioner said that he had known Wayne Seymour for a couple of years, and he denied that either had ever sold drugs to the other. He admitted that he had "a few things to drink earlier in the night" but said he was not using drugs and did not shoot anyone.

### B. The State Court Decisions

Petitioner was charged with attempted first-degree murder, but the judge convicted him of attempted second-degree murder under La. R. S. 14:30.1, which requires the State to prove beyond a reasonable doubt that the defendant had the specific intent to kill a human

Page 7 of 18

being and that he committed an overt act in furtherance of that goal. La. R. S. 14:27 and 14:30.1. Although the statute for the completed crime of second-degree murder allows for a conviction based on "specific intent to kill or to inflict great bodily harm," attempted second-degree murder requires specific intent to kill. State v. Bishop, 835 So.2d 434, 437 (La. 2003).

Judge Dorroh gave oral reasons for her verdict. She said she had "listened very carefully" to the witnesses and had listened to the recorded statements both in the courtroom and again in chambers. She credited the testimony of Bessie Jordan and Officer Zachary Johnson that Mrs. Jordan did not make a statement at the scene, despite the suggestion of such in Johnson's report. She found that Mr. Grant's statement that night was best understood as him saying that he did not know the identity of the person who fired the shots or which way they fled afterward. The witnesses had no quarrel with Petitioner, yet the three of them identified him as the shooter when shown a photo lineup, and Petitioner admitted he was there that night. Mr. Grant described the shots as coming from the direction of Petitioner's car and moving the dirt as the shots came closer to him. These facts were found to be sufficient to establish guilt. Tr. 613-15.

Petitioner challenged the sufficiency of the evidence on direct appeal. In evaluating such a claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 99 S.Ct. 2781, 2789 (1979). The Jackson inquiry "does not focus on whether the trier of fact made the

correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." Herrera v. Collins, 113 S.Ct. 853, 861 (1993).

The state appellate court reviewed the evidence in detail, set forth the Jackson standard, and compared the evidence to the elements of the crimes. It pointed to three witnesses who testified that shots were fired from the driver's side of Petitioner's car at the people gathered in the driveway of the Jordans' home. It found that specific intent to kill could be inferred from Petitioner's anger at being turned away from the party and his firing multiple rounds at a large group of people. State v. Patterson, 184 So.3d at 746-49. The Supreme Court of Louisiana denied writs without comment.

**C. Habeas Analysis**

Petitioner's sufficiency of the evidence claim was decided on the merits in state court. Habeas corpus relief is available with respect to a claim that was adjudicated on the merits in the state court only if the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d). Thus, a state-court decision rejecting a sufficiency challenge is reviewed under a doubly deferential standard. It may not be overturned on federal habeas unless the decision was an objectively unreasonable application of the deferential Jackson standard. Parker v. Matthews, 132 S.Ct. 2148, 2152 (2012); Harrell v. Cain, 595 Fed. Appx. 439 (5th Cir. 2015).

Petitioner argues that the witnesses cannot be believed because of perceived inconsistencies in their statements, intoxication, and general lack of credibility. Petitioner was undoubtedly proved guilty if the trial testimony of the prosecution witnesses is accepted as credible. He asks this court to second guess the credibility decisions made by the state courts, but the "credibility of the witnesses and the weight of the evidence is the exclusive province of the jury." Hebert v. Rogers, 890 F.3d 213, 225 (5th Cir. 2018), cert. denied, 139 S. Ct. 1290 (2019). "[U]nder Jackson, the assessment of the credibility of the witnesses is generally beyond the scope of review." Schlup v. Delo, 115 S.Ct. 851, 868 (1995). The trial judge made a reasonable, though perhaps debatable, assessment of credibility, and the appellate court reasonably applied the lenient Jackson standard to the facts presented. That decision withstands review under the applicable standard, so Petitioner is not entitled to habeas relief on this claim.

**Hearsay Exclusion Ruling**

Sgt. Plunkett was equipped with a body microphone that transmitted audio to his patrol unit's MVS system. That system recorded statements made by Plunkett, as well as other persons in his vicinity at the scene of the shooting. Defense counsel attempted to introduce a statement from the recording that was made by an unknown person 15 to 25 minutes after the shooting. There was a good deal of testimony about the time of the 911 call, the time that Plunkett activated his system, and discrepancies between the time clocks on the two systems, but it was undisputed that the statement at issue was made a significant time after the shots were fired and during the police investigation. Defense counsel said he had done everything he could to identify the speaker but had not been able to do so. He

argued that the statement should be submitted as an excited utterance exception to the hearsay rule.

The recording was difficult to understand. The judge at first said, "I don't even know what they're saying. I hear whoo whoo whoo, is what I hear." The recording was played again, and the judge said she heard the words "a black car" but nothing else. Eventually, with the aid of a laptop computer and ear buds, the judge said she was able to hear the portion of the recording at issue. The court heard extensive argument as to whether the statement fit the exception for an excited utterance under Louisiana hearsay law and ruled that it was not admissible.

The defense was allowed to make a proffer of the contents of the recording. Tr. 438-61. Petitioner represented in his appellate brief that the recording included a male voice stating that the shooter was driving a vehicle with "purple tinted windows," and a female describing the car as "black." A male voice reportedly said that "when they first pulled up, they stopped right about here, busted in the air about four or five times . . . and then they started pointing." A police officer is heard saying that the officers received many conflicting stories, and that the suspected shooters were two to three black males in a gray Dodge. Tr. 640. These interpretations of the recordings were also offered in a trial court filing. Tr. 252.

Petitioner's appellate brief on this issue was written solely in terms of whether the statements were admissible under the Louisiana Code of Evidence and Louisiana court decisions that have interpreted those articles. Tr. 646-50. Petitioner's pro se writ application to the Supreme Court of Louisiana also relied solely on the excited utterance

exception. Neither brief contended that federal constitutional law required the admission of the statements.

The appellate court's decision affirmed the trial court's ruling that the defense did not show that the statements fell within the excited utterance exception to the hearsay rule. The court also pointed out important questions such as the location of the unknown speakers when the shots were fired, whether the persons had been drinking and how much, and other issues that cast doubt on the credibility of the proffered statements. State v. Patterson, 184 So.3d at 749-51.

Petitioner argues in his brief to this court that the appellate court erred when it ruled that the MVS recordings were not admissible. His arguments rely solely upon Louisiana evidence law. A habeas applicant must claim violation of a federal constitutional right. A claim that the trial court improperly applied state law does not constitute an independent basis for federal habeas relief. Estelle v. McGuire, 112 S.Ct. 475, 479-80 (1991) ("We have stated many times that federal habeas corpus relief does not lie for errors of state law."); Narvais v. Johnson, 134 F.3d 688, 695 (5th Cir. 1998). The erroneous exclusion of evidence by the state court is a mere state law issue that does not warrant habeas relief unless it "is of such magnitude as to constitute a denial of fundamental fairness under the Due Process Clause." Porretto v. Stalder, 834 F.2d 461, 465 (5th Cir. 1987). Erroneous exclusion of evidence is fundamentally unfair only if the evidence was material in the sense that it was "crucial, critical, and highly significant." Id. Petitioner did not exhaust his state court remedies with respect to a due process or other federal claim based on the evidentiary ruling, and he has not argued such a federal claim in his brief. His only arguments in state

court and in this court have focused on state law, so he is not entitled to habeas relief on this claim.

**Cross-Examination of Ronnie Smith**

Petitioner argues that he was not able to adequately cross-examine Ronnie Smith about the attempted murder charges that were pending against Smith and, Petitioner argued, gave Smith motivation to assist the State in hopes of getting a plea bargain. Smith's testimony began with the assistant district attorney disclosing that Smith was "currently being prosecuted by me for a charge of attempted second-degree murder" in Caddo Parish. Smith testified that the prosecutor did not seek him out or ask his assistance, and his contact with the prosecutor had been initiated when Smith told his defense counsel about his information. Smith's counsel then arranged for Smith to give a recorded statement to investigators, on which recording the prosecutor stated that no deals would be made with Smith as a result of his statement. Tr. 463-67.

Defense counsel on cross-examination had Smith again admit that he was being prosecuted "in this courthouse, by the very same prosecutor who just questioned you, with attempted murder." Defense counsel asked Petitioner about the sentence he faced and started to ask about the charge being based on Smith shooting his wife, at which point the prosecutor objected. She argued that defense counsel should not be able to inquire into the specific acts of Smith's crimes. The trial judge ruled that counsel could ask Smith about what Smith perceived the State had told him about leverage or deals, but counsel could not ask Smith specifics about the facts of his case because it would violate Smith's right to remain silent in his case. Smith's counsel in his attempted murder case was present, and

he asserted his client's Fifth Amendment privilege in response to questioning about the particulars of the charged crime.

Petitioner's counsel then moved for a mistrial on the grounds that allowing Smith's testimony without full cross-examination violated Petitioner's Confrontation Clause rights. The court denied the motion and repeated that counsel had "free wide latitude to cross-examine him about his motives, his reasons for being here" and the like, but "you can't ask him about specific facts about the charges pending against him because that would violate his rights."  Counsel then asked Smith if he had a deal with the State regarding his testimony, and Smith said no.  Counsel asked why Smith was testifying, and Smith said he felt like it was the right thing to do.  He said he called himself "a man of God" and "when somebody do something wrong, I have to tell the truth."  He said, "I ain't asking for nothing.  I'm just telling the truth."  When asked if he expected the case against him to be dismissed, he said, "I don't know what God have in plan."  Tr. 474-84.

Petitioner argued on direct appeal that the cross-examination about the pending criminal charges should have been allowed under Louisiana Code of Evidence articles regarding attacks on credibility.  The brief made fleeting reference, in a long quotation from another case, to the "constitutional right of confrontation" and that cross-examination for the purpose of showing bias was "guaranteed by the state and federal constitutions." Tr. 650-55.

The appellate court began its discussion of this issue by noting that under the Sixth Amendment and a provision of the Louisiana constitution, an accused is guaranteed the right to confront and cross-examine the witnesses against him.  But it cited Louisiana

evidence articles that place limits on the ability to attack the credibility of witnesses. It found that the defense was allowed to confront and cross-examine Smith about any leverage the prosecutor might have or any hope for leniency that Smith might have held regarding his testimony. Details of his pending charges were not relevant, and inquiries would have violated Smith's right to remain silent. Accordingly, Petitioner was not deprived of his right to cross-examine Smith. State v. Patterson, 184 So.3d at 751-52.

Petitioner's writ application to the Supreme Court of Louisiana offered only a few paragraphs of combined argument about this and the excited utterance issues. Petitioner argued that Ronnie Smith's testimony was obviously self-serving and should not be believed. He added that when the prosecutor allowed Smith's testimony, her actions "bordered on prosecutorial misconduct." Petitioner did not cite any federal constitutional basis for a claim related to the denial of further cross-examination of Smith. Tr. 714-15.

An application for a writ of habeas corpus "shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). To satisfy the exhaustion requirement, a prisoner must fairly present his federal claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting the state courts to the federal nature of the claim. O'Sullivan v. Boerckel, 119 S.Ct. 1728, 1732 (1999). Petitioner did not identify a federal basis for his claim in his writ application, so he likely did not exhaust a federal claim as required by O'Sullivan. The State has, however, conceded in its brief that a claim was exhausted for habeas purposes. Doc. 8, pp. 16-17.

To the extent Petitioner argues that the state court violated the Louisiana Code of Evidence, that is not a basis for habeas relief. The Supreme Court has "stated many times that federal habeas corpus relief does not lie for errors of state law." Swarthout v. Cooke, 131 S.Ct. 859, 861 (2011). Petitioner's brief filed in this court repeats the state-law arguments set forth in his writ application filed in state court. He invokes no federal law and argues that he was "prevented from exercising his statutory right to impeach the witness' credibility by showing bias or interest." His reliance on statutory rights under state law does not provide a basis for habeas relief.

Even if Petitioner had briefed a federal claim, the Due Process Clause does not guarantee the right to introduce all relevant evidence. "The accused does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." Taylor v. Illinois, 108 S.Ct. 646, 653 (1988). Relevant evidence may be excluded on account of a defendant's failure to comply with procedural requirements, and "any number of familiar and unquestionably constitutional evidentiary rules also authorize the exclusion of relevant evidence." Montana v. Egelhoff, 116 S.Ct. 2013, 2017 (1996).

Defendants do have a well-established right to cross-examination, but the right is not unlimited, and it may be constrained by the rules of evidence. Boyer v. Vannoy, 863 F.3d 428, 448-49 (5th Cir. 2017) (denying habeas where Louisiana court denied cross-examination of a state witness, who the defense alleged was the actual killer, about his lack of prosecution for a domestic violence crime). Only "certain egregious evidentiary errors may be redressed by the due process clause." McCullough v. Cain, 370 Fed. Appx. 443,

447 (5th Cir. 2010) (state court's exclusion of statements provided to police by defendant's co-perpetrators did not deprive defendant of due process right to put forth defense).

Defense counsel was allowed to ask Smith any question he wanted about deals, hopes for deals, and other motivations for his testimony. And many such questions were asked. Counsel was forbidden only from asking Smith about the underlying details of the attempted murder charge that Smith faced. Those facts were of no relevance to bias or motivation for testifying, and questions about them intruded on Smith's right against self-incrimination, so the trial court acted reasonably to exclude them. Petitioner is not entitled to relief related to Smith's cross-examination even if he has exhausted and presented a federal claim.

Accordingly,

It is recommended that Petitioner's Petition for Writ of Habeas Corpus be denied.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar

that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

An appeal may not be taken to the court of appeals from a final order in a proceeding under 28 U.S.C. § 2254 unless a circuit justice, circuit judge, or district judge issues a certificate of appealability. 28 U.S.C. § 2253(c); F.R.A.P. 22(b). Rule 11 of the Rules Governing Section 2254 Proceedings for the U.S. District Courts requires the district court to issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate may issue only if the applicant has made a substantial showing of the denial of a constitutional right. Section 2253(c)(2). A party may, within fourteen (14) days from the date of this Report and Recommendation, file a memorandum that sets forth arguments on whether a certificate of appealability should issue.

THUS DONE AND SIGNED in Shreveport, Louisiana, this 31st day of May, 2019.

Mark L. Hornsby
U.S. Magistrate Judge